## DEVINE v. LOS ANGELES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF CALIFORNIA.

No. 207. Argued March 13, 1906.—Decided May 14, 1906.

Where diversity of citizenship does not exist a suit can only be maintained in the Circuit Court of the United States on the ground that it arises under the Constitution or laws of the United States, and it does not so arise unless it really and substantially involves a controversy as to the effect or construction of the Constitution or some law or treaty of the United States on the determination whereof the result depends. This must appear from plaintiff's statement of his own claim and cannot be aided by allegations as to defenses which may be interposed.

In this case held that as a bill to quiet title the jurisdiction of the Circuit Court could not be sustained by reason of allegations that defendant's adverse claims to the surface and subterranean waters of the Los Angeles river were based on an erroneous construction of the treaty of Guadalupe Hidalgo, the act of March 3, 1851, and certain state acts and city ordinances.

Nor can such jurisdiction be maintained of the suit as one to remove cloud on title, as a bill in equity will not lie to dispel mere verbal assertions of ownership or to adjudge state statutes and charters unconstitutional and void. If the statutes and charters are unconstitutional they are void and cannot constitute a cloud on title.

Where complainant claims title to land in California under Mexican grants confirmed by the Board of Land Commissioners as the State of California

is not in the line of such titles a statute of that State conferring water
rights on a city does not deprive complainants of their property or im-
pair the obligation of any contract as the State can only confer whatever
rights in such waters had vested in it.

COMPLAINANTS below, appellants here, are 244 in number and
own in severalty various tracts of land aggregating several thou-
sand acres, located in the county of Los Angeles, California, in
Ranchos San Rafael, Los Felis, and Providencia.   The Rancho
San Rafael was granted by the King of Spain and the other.
two ranchos by the Republic of Mexico to the predecessors of
complainants.   The titles were confirmed, pursuant to the
treaty of Guadalupe Hidalgo, to the successors of the original
grantees by the Board of Land Commissioners created by and
acting under an act of Congress approved March 3, 1851, en-
titled an act to ascertain and settle private land claims in the
State of California.   Patents were thereupon issued by the
United States to the confirmees and it was alleged that these
grants conveyed the title to the waters within them.

It was further alleged that the city of Los Angeles claimed
to be the successor in right and title to all the grants made by
the Spanish and Mexican governments to the Pueblo de Los
Angeles, and the city filed a claim before the Land Commis-
sioners in virtue of the general laws of Spain to sixteen square
leagues of land, alleging that the said lands had been granted
to the pueblo, which board confirmed the title of the city to
four square leagues of land but rejected its claim to the remain-
ing twelve square leagues, and that a patent was issued to the
city by the United States for the land so confirmed, which pa-
tent did not refer to the river or its tributary waters, and did
not purport to convey any of the waters of said river.   That
the city claimed the paramount right to the waters of the Los
Angeles river and the river itself in virtue of the grants, laws,
usages and customs of the Republic of Mexico and of the King-
dom of Spain, made and in vogue prior to the cession of the
territory embraced within the State of California to the United
States under the treaty of Guadalupe Hidalgo, and by virtue

of certain acts of the legislature of the State of California referred to in the bill, and especially by virtue of an act of the legislature of California passed April 4, 1850, incorporating the city of Los Angeles and declaring that it "shall succeed to all the rights, claims, and powers of the Pueblo de Los Angeles in regard to property, and shall be subject to all the liabilities incurred, and obligations created, by the Ayuntamiento of said Pueblo."

It was further alleged that the city never procured the confirmation of any rights in the waters of the Los Angeles river other than those that passed under the grant of land conferred by the patent, and that the act of the legislature, passed April 4, 1850, and certain other acts of the legislature and proceedings, acts and charters of the city set forth in the bill, are a cloud upon complainants' title to their lands. That the Los Angeles river runs through the three ranchos and thence through the city; that complainants' lands are riparian to the stream; that underlying complainants' lands are percolating waters which do not constitute a part of the river, but which by reason of the patents referred to, and mesne conveyances, belong to the several complainants as owners of said lands. The bill then went on to aver that the city claims that it is the owner of the river and its tributaries and their waters, passing through the ranchos named, and of the percolating waters in complainants' lands; that it claims the right to appropriate said waters for the use of the city and its inhabitants, and that complainants have no right to take any of the surface waters of the river or the percolating waters except in subordination to the city's paramount right to take and use the same, and that the city threatens and intends to institute suit in the state courts of California to enjoin complainants from using any of the waters possessed by them from wells on their lands.

That the city rests its right and claim to the river and its waters upon a certain construction of the treaty of Guadalupe Hidalgo and of the act of Congress of March 3, 1851, and upon certain acts of the California legislature and certain charters

of the city of Los Angeles adopted and approved in pursuance
of an erroneous construction of the treaty and the act of Congress; the acts and charters being enumerated.

It was further alleged that under said acts and said charters
the city has asserted and assumed the right to take physical
control of the Los Angeles river and its tributaries, and has
exercised the right of obstructing ditches and other conduits
maintained by owners of land in the valley of the river above
the city and of preventing the use of the waters of the river for
irrigation of the lands of complainants, and that said laws and
charters and the exercise of said rights have resulted in the
destruction of the values of the lands. And it was charged
that the acts of the legislature and the charters of the city of
Los Angeles were in violation of the Fourteenth Amendment
to the Constitution of the United States, in that they deprived
or attempted to deprive complainants of their property without
due process of law and to grant the same to the city of Los
Angeles; that the acts and charters impaired the obligation
of the contracts expressed in the patents of the United States ·
to complainants' lands; and that the assertion and exercise by
the city of the right to control the river and its waters were in
violation of section 1979, Title XXIV, of the Revised Statutes
of the United States.

And the bill further averred that the construction of the act
of Congress of March 3, 1851, upon which the defendant city
rested its right and claim to said river and to said waters, is
erroneous, and that, according to the proper construction
thereof, the city was required to present to the Board of Land
Commissioners its claim to the waters of the river for confirmation.

It was also alleged that the claims and threats of the city ·
to institute actions against complainants and the control which
it has exercised over the river and the waters thereof, and the
several acts of the legislature of California and the charter of
the city purporting to confer title to the river and its waters
upon the city as the successor to the Mexican pueblo, cast a

cloud upon the titles of complainants to their lands, and had, in large measure, destroyed the market values thereof.

It was prayed:

1. That a decree be granted complainants removing the cloud cast by the city of Los Angeles upon their titles to the lands described in the bill, and that the acts of the legislature of the State of California and the charters of the city be declared invalid in respect to conferring upon the city any rights in the waters of the Los Angeles river acquired from the pueblo of Los Angeles, other than such rights as were ascertained and confirmed under the act of March 3, 1851.

2. That a decree be granted to complainants and each of them quieting their several titles to their lands and to the waters therein, and to the riparian right of each of them to use the waters of said river, as against the paramount title claimed by said city to have been derived from Spain or Mexico, or claimed to have been derived from or to be supported by said acts of the legislature of the State of California, or by the charter of said city; and also that it be decreed that complainants and the city have each and severally such title only derived from Spain and Mexico as was confirmed and patented to them or their predecessors by the act of Congress of March 3, 1851.

3. That a decree be granted to complainants forever enjoining the city of Los Angeles from setting up or asserting such paramount right and title to said waters; and further enjoining said city from asserting and exercising dominion or control over said river and said waters under or by virtue of said acts of the legislature or said charter of said city of Los Angeles.

It was alleged in the answer that by the terms of each of the grants to the three ranchos named in the bill, and by the laws of the Government making the same, all of the waters within any of the lands embraced in said ranchos, which formed a part of or found their way into the surface or subterranean stream of the Los Angeles river, were excepted and reserved in favor of the pueblo of Los Angeles, and that none of said

waters were confirmed or granted by the United States to complainants' predecessors.

It was admitted that the city claimed to be, and it was alleged that the city was, in fact, the successor to all the rights and grants made by the Spanish and Mexican Governments to the pueblo of Los Angeles.

The answer further alleged that the patent issued by the United States to the city of Los Angeles purported to grant to the mayor and council of the city of Los Angeles all appurtenances belonging to the land therein granted, which included all the waters of the river and the right to the use of the same.

It was admitted that the city claimed the paramount right to the waters of the Los Angeles river, by virtue of grants, laws, usages and customs of the Republic of Mexico and the Kingdom of Spain and the act of the legislature approved April 4, 1850, mentioned in the bill, but it was denied that these were the only sources of title through which the city claimed; and alleged that it also claimed said paramount right by virtue of long-continued use and possession of said river and the waters thereof for the period of more than one hundred and twenty years, and by various grants and conveyances from private individuals, and by virtue of various judgments and decrees of courts of competent jurisdiction and of the patents to the mayor and common council of the city of Los Angeles, mentioned in the bill, and also by virtue of its ownership of various tracts of land, which are riparian to said river, amounting in area to more than four thousand acres, embracing the land through which the river flows in passing through the lands included in said patent.

The answer disclaimed that the city acquired, under the act of the legislature passed April 4, 1850, any right to the Los Angeles river, or the water thereof, or any other water or right which was, at the time of the passage of said act, vested in the predecessors of complainants, or any private individual or corporation.

The answer denied that the acts of the legislature, or the

proceedings or acts or charter of the city, referred to in the bill, constituted any cloud upon complainants' titles, but, on the contrary, alleged that none of complainants had, at the time of the commencement of the suit, or have now, any right or interest in or to the waters of the Los Angeles river, save in subordination to the paramount right of the city to take and use all of the waters of said river to the extent of the necessities of the city or its inhabitants.

The answer alleged that all of the waters underlying complainants' lands form and constitute a part of the Los Angeles river, and would, if not intercepted, reach the surface stream of the river at a point above the northern boundary of the city, and denied that any of said waters belonged to the several complainants, or that they, or any of them, have ever had any ownership of said waters, save in subordination to the paramount right of the city to take and use said waters, so far as it and its inhabitants might need the same.

It was denied that in the petition of the mayor and common council of the city of Los Angeles to the Board of Land Commissioners for confirmation of the pueblo lands, no claim was made to the waters of the Los Angeles river, and alleged that the Board of Land Commissioners, in its finding and judgment confirming the claim of the city to the pueblo lands, also confirmed its claim to the rights with respect to the waters of the river which were possessed by the pueblo; and it was admitted that the city of Los Angeles had in the past claimed and still claimed to be the owner of all the waters of said river, and of its tributaries, from its sources of supply to the southern boundary of the city, and also of all of the waters existing in complainants' lands, and of the waters under said lands; and it was alleged that all of the waters in those lands did in fact constitute a stream or watercourse, and were part of the waters of the Los Angeles river. The city admitted that it claimed that complainants had no right to pump the waters in their lands, because such pumping might ultimately have the effect of reducing the supply in the surface and subterranean river,

and it was denied that they were percolating waters, and also denied that the city claimed the right to enter on the lands of any of complainants to take or use said waters, or any part thereof, without having first obtained the right so to do, by grant from or condemnation against said complainants. It was admitted that the city claimed the right to prevent complainants from using the waters in their lands when the city had need of the same, but denied that it claimed the right to prevent complainants from using said waters by entering upon their lands or by using physical force, and alleged that the city claimed the right to prevent the use of said waters by complainants only in the manner prescribed by the laws of the State of California, and that the city intended to enforce its rights against complainants by means of the suit brought by it, as alleged in the bill, in the state court against certain of the complainants, for the purpose of enjoining them from using the waters pumped by them from their lands, and by means of other legal process, and not by any unlawful acts or physical force.

It was admitted that the city rested its claim to the Los Angeles river and the waters thereof, including the waters in the lands of complainants, in part upon the treaty of Guadalupe Hidalgo, according to the manifest meaning thereof, viz., that the rights of pueblos were intended to be protected by said treaty, as well as the rights of individuals; and it was admitted that the city rested its claim in part upon the act of Congress of March 3, 1851, according to the manifest meaning thereof, viz., that the claims of pueblos and of municipal corporations succeeding them to lands granted by the Spanish and Mexican Governments were entitled to confirmation, and that the confirmation thereof had the effect of confirming all water rights which were appurtenant to said lands, and that said act did not require claims for property other than lands to be presented for confirmation.

It was denied that the city rested its claim to the Los Angeles river and its waters, including the waters in the lands of

complainants, upon the laws of the State of California and the ordinances and charters of the city of Los Angeles, except to the extent that the same had the effect of vesting and continuing in the city and its predecessors such rights with respect to the waters of the Los Angeles river as were possessed by the pueblo at the time the pueblo was dissolved and the city was incorporated by the act of April 4, 1850, and such rights with respect to the waters of the river as might have been vested in the State of California upon its admission to the Union.

It was expressly disclaimed that there was granted by said acts of the legislature, or by the city charter, to the mayor and common council of the city of Los Angeles any right to develop waters percolating under the bed of the Los Angeles river or elsewhere, which at the time of the passage of said acts, or at the time of the adoption of said charter, was vested in the complainants, or any of them, or in their predecessors, or in any private individual or corporation.

It was alleged that the legislative acts and the ordinances and charters mentioned in the bill were adopted with the intention of asserting that the city of Los Angeles was the owner of all the rights possessed by the pueblo of Los Angeles to the waters of the Los Angeles river, and not with the intention of depriving complainants, or any of them, or any of their predecessors, or any other private individual or private corporation, of any right in respect to the waters of said river; and denied that by any of said acts of the legislature mentioned in the bill, or by the charter of the city or the amendments thereof, there was intended to be granted to the city any right with respect to the water, flowing in said river or beneath the surface of the bed thereof, which was then vested in complainants, or any of them, or any of their predecessors, or any private individual or private corporation, or that by any of said acts it was intended to divest any private person or corporation of any vested private rights in said waters, or that any of said acts had ever been construed by any court in the State of California

to so divest any such private vested rights, but on the contrary it was alleged that it had been determined by the Supreme Court of California that said acts did not have such effect.

The answer denied that the city had ever interfered with the appellants in the use of the waters of the river or its tributaries, or the waters of said valley, except when such waters were located on or in the lands of the city or on or in lands on which the city had acquired the right of entry to divert and use said waters, except when the city has interfered with such use by judgments of court obtained by due process of law, and denied that the city has ever assumed or asserted the right to take physical control of any waters on or in complainants' lands. It was disclaimed that the acts or charters referred to in the bill granted to the city the right to take physical control of property belonging to complainants.

The answer denied that the acts of the legislature and the ordinances and charters of the city of Los Angeles, mentioned in the bill, or any of them, were in violation of the Fourteenth Amendment, or impaired the obligation of contracts, or were in violation of section 1979, Title XXIV, of the Revised Statutes of the United States.

The answer alleged that according to the proper construction of the act of March 3, 1851, the confirmation and patent therein provided for only had the effect of confirming to the confirmee and patentee the lands therein described, but subject to all the easements and servitudes imposed thereon by the laws of Spain and Mexico in favor of third parties, including the rights to the waters of unnavigable streams which were attached to other lands, or belonged to pueblos or private individuals other than the grantees. And where such water rights were appurtenant to lands granted by the Spanish and Mexican Governments and confirmed and patented under said act of Congress, such water rights passed by such patents, and a claim for such water rights was not required by such act to be confirmed or patented.

It was admitted that the city claimed that complainants had no right to the waters of the Los Angeles river, including the waters in other lands, as against the city and its inhabitants, when the city shall determine that it needs said waters, and that the city claims that the use by the complainants of such waters is at the sufferance of the city, and may be prohibited by the city at any time, and that the city is threatening to institute suits against complainants for the purpose of enforcing such claims, but it is denied that any and all said claims or any dominion or control which the city has exercised over the river and the waters thereof has cast any cloud upon the several titles of complainants to their lands or affected the market value or salability of such lands.

It was alleged in the answer that in the year 1781 a pueblo was founded on the site of the present city of Los Angeles by the Government of the Kingdom of Spain, and that, according to the laws and regulations of that country, said pueblo became entitled to the sole and exclusive right in perpetuity to the absolute ownership of all the waters of the Los Angeles river, whether flowing upon or beneath the surface of the ground; that said river then rose and now rises several miles above the site of the pueblo and ran and still runs down through said site to the lands now embraced within the city of Los Angeles; that during the whole of the occupation and control of said pueblo by the Spanish and Mexican Governments the municipal authorities at all times exercised control of and claimed the exclusive right to use all the waters of said river, and that right was during all of said time recognized and acknowledged by the owners of all of the lands bordering on said river, including the predecessors of complainants; that ever since the occupation and control of said pueblo by the United States and by the State of California the municipal authorities of the city have exercised the same rights over and to the waters of the river as were previously exercised and claimed by the authorities of the pueblo, and that such control and rights were exercised and claimed for the purpose of irrigation

and for the domestic and other uses of said pueblo and said city and the inhabitants thereof.

It was further alleged that within one year after the foundation of the pueblo the municipal authorities thereof constructed a system of irrigation works and conveyed the waters of the river to and upon lands in the pueblo, and that thereafter from time to time other lands of the pueblo were brought under irrigation, so that all of said waters were diverted from said river and used for such irrigation during a period of many years prior to the conquest of California by the United States, and that, from and after such conquest, the same use was made of the waters of the river for the irrigation of lands within the pueblo and for domestic use of its inhabitants up to the time of the passage of the act of April 4, 1850, incorporating the city of Los Angeles; that from and after that time the municipal authorities of said city continued to construct additional works for the more economical diversion and distribution of such waters for use in irrigating lands within said city and for domestic use of the inhabitants thereof; that within the past eighteen years nearly all of said irrigable lands have been divided into building lots and covered with houses, so that all of the waters previously used for the irrigation of said lands, excepting the portion thereof which has been diverted by complainants within the last five years, have been used by the city and its inhabitants for purposes other than for irrigation, and all of the waters of said river during the dry season of each year, extending from the first day of May to the first day of November, and a great portion of said waters during the rest of the year, have been needed for said uses. That the population of said city is not less than 180,000 people, and is increasing at the rate of more than 10,000 per year, and that the city has no other source of water supply except said river.

It was alleged that, with certain exceptions referred to therein, the pueblo of Los Angeles, from the time of its foundation in the year 1781, up to the incorporation of the pueblo as a

city by the act of 1850, and the said city from that time until now has continuously, exclusively and adversely to the whole world used all of the waters of the Los Angeles river under a claim of ownership of said waters, the exceptions referred to being claims made by certain persons at various times of rights to the use of the waters of the river and of affluents thereof, which have been litigated and decided by the state courts in favor of the city, and it was further alleged that within the past twelve years certain owners of lands in which flowed underground waters of the river have set up a claim that said waters were not a part of the river and that they were entitled to take and appropriate said underground waters for their own use, and that, in pursuance of such claims, great numbers of said parties, including some of complainants, had constructed wells and engaged in pumping large quantities of said water, thereby diminishing the surface flow of the river, and that it was for the purpose of preventing such diminution that the city was bringing and contemplated bringing the actions against complainants referred to in the bill; that within the past five years such abstraction of these underground waters did not interfere with the supply of water required by the city, but within the past three years the amount of diversion by means of said wells has increased so much and the needs of the city and its inhabitants have also so greatly increased that the waters of the river which reached the surface stream thereof and the underground diversion works of the city have not been sufficient to supply it and its inhabitants with the water needed by them.

It was also alleged that the city in its corporate name or in the name of the board of water commissioners is the owner of numerous tracts of land which are riparian to the river, and which are particularly described in the answer. And further, that in the year 1879 two actions were commenced by predecessors of some of complainants against the city of Los Angeles, claiming the right to divert and use waters of the river, and both of said actions were finally determined by the Supreme

Court of the State of California against the plaintiffs and in favor of the city, and it was alleged that complainants, who are successors in interests of the plaintiffs in the suits last mentioned, are by said judgments estopped to deny that the city is the owner of a paramount right to use so much of the waters of the Los Angeles river as it and its inhabitants may need.

Thereafter the city of Los Angeles, by its counsel, moved the court to dismiss this cause on the ground that it appeared that the court had no jurisdiction thereof, which motion was sustained and the bill dismissed, whereupon the cause was brought here on certificate.

*Mr. Cyrus F. McNutt,* with whom *Mr. Warren E. Lloyd* and *Mr. J. E. Harmon* were on the brief, for appellants:

The bill presents several Federal questions. It is not an action under § 738 of the Code of Civil Procedure of California to quiet title generally, but a bill in equity to remove clouds from complainants' titles. However that section is construed by the California courts, as providing an exclusive remedy for quieting titles to land, the legislature and the courts of the State cannot affect the equity practice and jurisdiction in the Federal courts.

The original jurisdiction in equity, conferred by the Constitution, imposes the duty to adjudicate according to the rules of the English Chancery Court, as administered from the time of the emigration of our ancestors, down to the period when the Constitution was formed. *Pennsylvania* v. *Wheeling &c. Bridge Co.,* 18 How. 492. The equity jurisdiction of the Federal courts is the same as the English High Court of Chancery, and is not subject to limitation or restraint of state legislation. *Payne* v. *Hook,* 7 Wall. 430.

Equity practice and jurisdiction of Federal courts is uniform throughout the United States, and cannot be varied by state laws. *Russell* v. *Southard,* 12 How. 147.

The act of 1872, requiring pleading and procedure in civil causes in the Circuit and District Courts to conform, as near

as may be, to the practice in state courts, has no application to equity or admiralty causes. *Blease* v. *Garlington*, 92 U. S. 8; *Bucher* v. *Cheshire R. R.*, 125 U. S. 582.

Though state legislatures may abolish, in state courts, the distinction between actions at law and actions in equity, by enacting that there shall be but one form of action, which shall be called "civil action," yet the distinction between the two sorts of proceedings cannot be thereby obliterated in the Federal courts. *Thompson* v. *R. R. Companies*, 6 Wall. 134.

The allegations of the bill raise Federal questions by setting out the claim of title by complainants and the clouds cast on such title by the defendants, claiming under a treaty and various laws of the United States and its predecessor in title and sovereignty as well as various acts of the legislature of California which are in violation of the Constitution.

The admissions and averments in the answer are in answer to the charge in the bill, that the city's claim to the river and its waters and the waters in complainants' lands, is rested in part upon a construction of the treaty of Guadalupe Hidalgo, which construction, and that alleged to be placed upon the act of Congress of March 3, 1851, are set forth with particularity.

Whether such admissions in defendant's answer to the averments of the bill in this respect, will be considered as strengthening such averments of the bill, must depend upon whether this court will look beyond the bill in determining whether a Federal question is presented there; and if so, whether there be any matter in the answer defeating such jurisdiction. In either event, the treaty of Guadalupe Hidalgo is fairly drawn into this cause, and whether the averments of the bill alone, or such averments and the admissions of the answer, be considered, the construction of that instrument must be had in order to a proper determination of the controversy here.

The amended bill is framed according to the rules of equity pleading established by this court under § 917 of the Revised Statutes, and in all respects follows well settled practice in

equity. Under Equity Rule 21, the complainant has a right to state defendant's claims and in certain suits they form the very gist of the action. Having been properly pleaded, it is for the court to determine whether or not they form a logical and necessary portion of complainants' case. If they do, there is no doubt that the court may regard them in determining its jurisdiction. When the claim of the defendant is no longer a supposed pretense or excuse, but a specific cloud on title, evidenced by written instruments and records and specific acts, the plaintiff is unable to state his cause of action at all without alleging it. Such allegations are no longer the charging part of the bill but its very substance. If not alleged, evidence will not be received regarding them. Foster's Federal Practice, § 67; *Crockett* v. *Lee*, 7 Wheat. 522.

The acts of the legislature of the State of California complained of are *prima facie* valid and a cloud on title, and complainants have a right in equity to have the same removed and the claims of defendant thereunder quieted. 7 Cyc. 255, Article "Cloud on Title." Courts of equity always show the highest solicitude regarding land titles and will afford a remedy appropriate to the circumstances of each case. *Sharon* v. *Tucker*, 144 U. S. 533.

Complainants claim protection under the Fourteenth Amendment of the Constitution of the United States, in that the legislative acts and municipal acts and ordinances pleaded, deprive, or attempt to deprive, them of their property without due process of law.

If the complainants have the title in their lands which they allege, an act of the legislature of California granting to defendant the exclusive right to all the waters in the river Los Angeles is an attempt to deprive complainants of property protected by the Constitution. As a matter of fact, it has unsettled all land titles in the valley through which the Los Angeles river runs. Defendant claims every benefit of these legislative acts. It denies that complainants ever owned any of the waters in their lands. Coupled with this, it attempts the

disclaimer as to "vested" rights. Having denied the vested rights, the disclaimer becomes but another way by which defendant asserts title.

The proposition is untenable that the city of Los Angeles, even through its common council, could disclaim, deny or in any way affect the validity of a legislative enactment. No power outside of a judicial tribunal is clothed with any such authority. It would be a dangerous doctrine to establish in this country, to hold that the exercise of powers by the legislature of a State, or the effect of its enactments, can be so revised and annulled by a party to a suit.

No authority is anywhere shown as coming from the city council, authorizing or empowering its counsel, appearing in this case, to make any such disclaimer as is attempted to be made in the answer.

The acts, ordinances and charters in favor of defendant, alleged in the bill, impair the obligation of the contracts made through and by the several patents of the United States to the predecessors in title of complainants.

The complainants are subjected to the deprivation of property rights, privileges and immunities secured to them by the Constitution and laws of the United States, under color of the statutes of the State of California, referred to in the bill, and in violation of section 1979, Title XXIV of the Revised Statutes.

*Mr. W. B. Matthews* and *Mr. J. R. Scott,* with whom *Mr. Henry T. Lee* was on the brief, for appellee:

As the requisite diversity of citizenship does not exist, the court has no jurisdiction of this suit unless it is one arising under the Constitution, laws or treaties of the United States.

A case arises under the Constitution, a law or a treaty of the United States, only when its correct decision depends upon the construction of the Constitution or of such law or treaty. *Cohens* v. *Virginia,* 6 Wheat. 379; *Osborne* v. *Bank of the United States,* 9 Wheat. 822; *Tennessee* v. *Davis,* 100 U. S. 264;

*Bankers' Casualty Co.* v. *Minn., St. P. &c. Ry.,* 192 U. S. 371, 381; *New Orleans* v. *Benjamin,* 153 U. S. 411.

The jurisdiction of the court must be made to appear from complainants' statement of their own claims, and not from their statement of the nature of the defendant's claim.

While the appellants, in the prayer of the bill, ask for a decree quieting their title to the lands described in the bill, it is evident that they did not intend by their pleading to state a cause of action to quiet title under the old chancery practice. See *Boston &c. Mining Co.* v. *Montana Ore Co.,* 188 U. S. 632.

It is apparent that this bill was intended to be framed under section 738, Code of Civil Procedure of California. This statute is similar to statutes in many other States, upon the same subject, and it has the effect of enlarging the ancient jurisdiction of courts of equity in respect to suits to quiet title. *Wehrman* v. *Conklin,* 155 U. S. 314, 325. These enlarged equitable rights are administered in Federal courts, so far as they do not conflict with any provision of the Constitution or with the statutes of the United States. *Broderick's Will,* 21 Wall. 503; *Holland* v. *Challen,* 110 U. S. 15, 26; *United States* v. *Wilson,* 118 U. S. 86; *Frost* v. *Spitley,* 110 U. S. 557.

Section 738 of the Code of Civil Procedure of California, was copied from the old Practice Act of that State, Laws Cal. 1851, pp. 92, 93, in reference to which the Supreme Court of California, in the case of *Head* v. *Fordyce,* 17 California, 151, said:

"The act was intended to embrace every description of claim whereby the plaintiff might be deprived of the property, or its title clouded, or its value depreciated, or whereby the plaintiff might be incommoded or damnified by the assertion of an outstanding title, already held, or to grow out of the adverse pretension."

The allegations of the bill, that the adverse claims of the city to the waters of the Los Angeles river, and the waters in the lands of the complainants, are based upon an erroneous construction of the treaty of Guadalupe Hidalgo, etc., are un-

necessary to a statement of appellants' case in a suit to quiet title to such property under the enlarged equitable jurisdiction of the Circuit Court. These allegations are plainly intended to raise a Federal question where none would otherwise appear, and they are, therefore, improper. *Tennessee* v. *Union & Planters' Bank,* 152 U. S. 454; *Boston &c. Mining Co.* v. *Montana Ore Co.,* 188 U. S. 632; *Arkansas* v. *Kansas & Texas Coal Co,* 183 U. S. 185; *Florida Central &c. Railroad* v. *Bell,* 176 U. S. 321.

The bill discloses an entire misconception, on the part of the appellants, of the nature and purpose of a suit to remove a cloud, in two particulars: first, such a suit is aimed at an instrument or record and not at mere threats, claims, or pretensions; and, second, it is not available for the purpose of having a statute canceled, or adjudged to be void. *Castro* v. *Barry,* 79 California, 443, 446; *Pixley* v. *Huggins,* 15 California, 127; *Parker* v. *Shannon,* 121 Illinois, 452; *Burr* v. *Hunt,* 18 California, 303; *Hannewinkle* v. *Georgetown,* 15 Wall. 547.

It is manifest that, by the force of the terms used, a statute, which is alleged to be unconstitutional, cannot, at the same time, be alleged to constitute a cloud upon a title. If it is unconstitutional, it is a nullity. An unconstitutional law is void and is no law. *Siebold's Case,* 100 U. S. 376. This is a general rule of equity in suits to remove a cloud on a title and it is embodied in sections 3412 and 3413, of the Civil Code of California, which provide substantially that where an instrument is void on its face or upon the face of another instrument which is necessary to the use of the former in evidence, it is not to be deemed capable of creating a cloud. *Williams* v. *Corcoran,* 46 California, 553. So in this case the statutes and charters which are declared in the bill to be obnoxious to the Constitution of the United States, if they are subject to that objection, are void on their face, and therefore do not constitute a cloud on the title of appellant.

The question of the repugnancy of the acts of the legislature

and the charters of the city to the Federal Constitution is primarily for the state courts.

The question of the repugnancy of these acts or charters to the impairment clause or the deprivation clause of the Constitution, does not actually or necessarily arise under the allegations of the bill. The judicial power extends to all cases in law or equity, arising under the Constitution, but these are cases actually, and not potentially, arising, and jurisdiction cannot be assumed on mere hypothesis. *New Orleans* v. *Benjamin*, 153 U. S. 411, 424; *Defiance Water Company* v. *Defiance*, 191 U. S. 184.

Section 1979, Title XXIV, Revised Statutes of the United States, has no application to suits of this nature. *Holt* v. *Indiana Manufacturing Company*, 176 U. S. 68.

The fact that the United States, in issuing patents to the predecessors of the appellants, under the act of March 3, 1851, did not pretend that it was the owner of such lands, is shown by the provisions contained in the act, that patents issued thereunder shall be " conclusive between the United States and said claimants only, and shall not affect the interests of third persons." The act is not drawn in question and made the subject of dispute merely because adverse claims are made to rights claimed thereunder. *Cook County* v. *Calumet & C. Canal & D. Co.*, 138 U. S. 653; *Blackburn* v. *Portland Gold Mining Co.*, 175 U. S. 571; *DeLamar's Nevada Gold Min. Co.* v. *Nesbitt*, 175 U. S. 523.

The disclaimers contained in the answer effectually remove any possible ground of Federal jurisdiction. *Crystal Springs Land & Water Co.* v. *Los Angeles*, 177 U. S. 169; *Boston &c. Mining Co.* v. *Montana Ore Co.*, *supra.*

MR. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

There being no diversity of citizenship, the jurisdiction of the Circuit Court could only be maintained upon the ground

that the suit arose under the Constitution or laws or. treaties of the United States, and. a suit does not so arise unless it really and substantially involves a dispute or controversy as to the effect or construction of the Constitution or some law or treaty of the United States, upon the determination of which the result depends. And this must appear from the plaintiff's statement of his own claim, and cannot be aided by allegations as to the defenses which might be interposed.

. Complainants prayed for a decree quieting their title to the lands described in the bill, but the averments did not bring the case within the classes of bills of peace or to quiet title, recognized by the usual chancery practice as succinctly stated in *Boston &c. Mining Company* v. *Montana Ore Company,* 188 U. S. 632. It was apparently framed under section 738 of the California Code of Civil Procedure, providing that "an action may be brought by any person against another who claims an estate or interest in real property adverse to him, for the purpose of determining such adverse claim." This statute enlarged the ancient jurisdiction of courts of equity in respect of suits to quiet title, but, the equitable rights themselves remaining, the enlargement thereof may be administered by the Circuit Courts of the United States as well as by the courts of the State. *Broderick's Will,* 21 Wall. 503; *Holland* v. *Challen,* 110 U. S. 15; *Gormley* v. *Clark,* 134 U. S. 338,. 348.

It seems, and it has often been held by the Supreme Court of California, that in an action under this section it is not necessary that the complaint should allege the nature of the estate or interest claimed by the defendant. *Head* v. *Fordyce,* 17 California, 149, 151; *Castro* v. *Barry,* 79 California, 443; *Mining Company* v. *Mining Company,* 83 California, 589.

We are dealing with the question of the jurisdiction of the Circuit Court, and the general rule as to that is thus stated by Mr. Justice Peckham, speaking for the court, in *Boston Mining Company* v. *Montana Ore Company,* 188 U. S. 632:

"It would be wholly unnecessary and improper in order to prove complainant's cause of action to go into any matters of defense which the defendants might possibly set up, and then attempt to reply to such defense, and thus, if possible, to show that a Federal question might or probably would arise in the course of the trial of the case. To allege such defense and then make an answer to it before the defendant has the opportunity to itself plead or prove its own defense is inconsistent with any known rule of pleading so far as we are aware, and is improper.

"The rule is a reasonable and just one that the complainant in the first instance shall be confined to a statement of its cause of action, leaving the defendant to set up in his answer what his defense is.

*     *     *     *     *     *     *     *

"The cases hold that to give the Circuit Court jurisdiction the Federal question must appear necessarily in the statement of the plaintiff's cause of action, and not as mere allegations of the defense which the defendants intend to set up or which they rely upon. *Third Street Railway Company* v. *Lewis*, 173 U. S. 457."

Tested by this rule, we are of opinion that, as a bill to quiet title, the jurisdiction of the Circuit Court cannot be sustained by reason of the allegations that defendant's adverse claims are based on an erroneous construction of the treaty of Guadalupe Hidalgo, the act of March 3, 1851, and the acts of the legislature of California, and ordinances and charters of the city of Los Angeles, enumerated, as clearly shown hereafter.

But complainants, appellants here, deny that the present case was brought under section 738, and say that the bill was one to remove clouds from complainants' titles, that is to say, clouds created by claims and threats, and by the several acts of California, including defendant's charters, which complainants ask to be declared invalid.

We do not understand, however, that a bill will lie to dispel mere verbal assertions of ownership as clouds on title, or, in-

voking equity interposition on the ground of the removal of clouds, that decrees may be sought adjudging statutes unconstitutional and void. If it were true that the statutes and charters referred to in the bill were unconstitutional as alleged, they were void on their face, and could not constitute a cloud on complainants' titles.

The test as to when a cloud is or is not cast, as stated by Mr. Justice Field, then Chief Justice of California, in *Pixley* v. *Huggins,* 15 California, 127, and reasserted in *Hannewinkle* v. *Georgetown,* 15 Wall. 547, is undoubtedly applicable, and demonstrates that the assertion of unconstitutionality cannot be resorted to to maintain Federal jurisdiction as constituting a cloud. The averment of unconstitutionality. in such circumstances is a mere pretext to obtain that jurisdiction.

According to the bill, complainants' titles were derived from Spain and Mexico by virtue of grants to their predecessors from those countries, which were confirmed by the Board of Land Commissioners. The State of California was not in the line of such titles, so that the acts of the legislature and the charters of the city complained of manifestly did not have the effect of depriving complainants of their property or of impairing the obligation of any contract, but simply conferred on the city such rights in respect of the waters of the river as may have been vested in the State.

*Hooker* v. *Los Angeles,* 188 U. S. 314, was a suit brought by the city to condemn a tract of land riparian to the Los Angeles river, and embraced in one of the ranchos described in the present bill. It originated in the Superior Court of the County of Los Angeles under the title of *City of Los Angeles* v. *Pomeroy,* was carried to the Supreme Court of the State, and there affirmed. 124 California, 597, 637, 638. It involved the question of the respective rights of the city and of the defendants to the water of the Los Angeles river. The state Supreme Court said:

"No act of the legislature . . . can diminish or change

the rights of the defendants in these lands derived from their predecessors, the Mexican and Spanish grantees. . . .

"The defendants hold their lands as successors to several Spanish and Mexican grantees, under patents from the United States based upon the original grants. They claim that, even conceding the rights of the pueblo and the city's succession to those rights (a concession which they make only for the purposes of the argument on this point), they are still, by virtue of their ownership of the lands in question, entitled to the exercise of full riparian rights, except so far, an so far only, as those rights are impaired by the paramount rights of the pueblo as they existed before the change of flag and without any legislative addition thereto.

"This claim, we think, is clearly just. The legislature of California could grant nothing to the city of Los Angeles which belonged to others, and the rights of the city, as successor to the pueblo, in the lands of riparian proprietors holding under Mexican and Spanish grants, cannot exceed the rights of the pueblo itself."

The case was brought here on writ of error, and we said:

"And so as to certain statutes of the State of California, which declared that the city of Los Angeles is vested with the paramount right to the surface and subterranean water of the Los Angeles river. Those statutes were admitted in evidence merely to show that the city was the successor of the ancient pueblo. The court held that the right of the city of Los Angeles to take from the Los Angeles river all of the waters of the river to the extent of its reasonable domestic and municipal needs was based on the Spanish and Mexican law, and not on the charters of the city of Los Angeles. The validity of the statutes, on account of repugnancy to the Federal Constitution, was not drawn in question in the trial court nor in the Supreme Court of the State, and both courts held that they neither granted to the city nor took away from plaintiffs in error any rights or property."

This being so, the averments of deprivation or impairment afforded no proper basis for jurisdiction, and as to section 1979 of the Revised Statutes, that was inapplicable. *Holt* v. *Indiana Manufacturing Co.*, 176 U. S. 68.

In truth, the questions as to the nature and extent of complainants' titles or rights, as put forward in the bill, are not Federal questions, but questions of state or general law.

In *Hooker* v. *Los Angeles, supra,* it was contended that the decision of the state court against the claim of plaintiffs in error to certain riparian rights and in certain alleged percolating waters, which rights were alleged to be derived from a patent of the United States, and confirmed Mexican grants, was a decision against a title, right, privilege, or immunity claimed under the Constitution or some statute or treaty of the United States, and so reviewable here. But this court held otherwise, and we said:

"Obviously, the question as to the title or right of plaintiffs in error in the land, and whatever appertained thereto, was one of state law and of general public law, on which the decision of the state court was final. *San Francisco* v. *Scott,* 111 U. S. 768; *Powder Works* v. *Davis,* 151 U. S. 389. And the question of the existence of percolating water was merely a question of fact.

"The patents were in the nature of a quitclaim, and under the act of March 3, 1851, were 'conclusive between the United States and the said claimants only, and shall not affect the interests of third persons.' The validity of that act was not drawn in question in the state court, and as the right or title asserted by plaintiffs in error was derived under Mexican and Spanish grants, the decision of the state court on the claims asserted by plaintiffs in error to the waters of the river was not against any title or right claimed under the Constitution or any treaty, or statute of, or commission held, or authority exercised, under the Constitution. If the title of plaintiffs in error were protected by the treaty, still the suit did not arise thereunder, because the controversy in the state court did not in-

volve the construction of the treaty, but the validity of the title of Mexican and Spanish grants prior to the treaty."

   *Crystal Springs Land & Water Company* v. *Los Angeles*, 177 U. S. 169, was a bill brought in the Circuit Court for the Southern District of California, and that court ruled, 82 Fed. Rep. 114, that where both parties claimed under Mexican grants, confirmed and patented by the United States in accordance with the provisions of the treaty of Guadalupe Hidalgo, and the controversy was only as to what were the ·rights thus granted and confirmed, the suit was not one arising under a ·treaty so as to confer jurisdiction on a Federal court, and that where the only ground of Federal jurisdiction was the allegation that defendant's claim of title was based in part on certain acts of the legislature of the State, which attempted to transfer to it, as alleged, the title held by complainants' grantors at the time of their passage, the court would not retain jurisdiction when an answer was filed by defendant denying the allegations; and disclaiming any title or claim of title not held by it before the passage of the acts. The bill was dismissed, and we affirmed the judgment.

   We there cited, among other cases, *Phillips* v. *Mound City. Association*, 124 U. S. 605, and *Robinson* v. *Anderson*, 121 U.·S. 522. In the one case it was adjudged, as stated in the syllabus, that ."an adjudication by the highest court of a State that certain proceedings before a Mexican tribunal prior to the treaty of Guadalupe Hidalgo were insufficient to effect a partition of a tract of land before that time granted by the Mexican Government to three persons who were partners, which grant was confirmed by commissioners appointed under the provisions of the act of March 3, 1851, 9 Stat. 631, 'to ascertain and settle the private land claims in the State of California,' presents no Federal question which is subject to review here."

   In the other, that under the act of 1875, even if the complaint, standing by itself, made out a case of jurisdiction, it was taken away as soon as, when the answer came in, it appeared that defendants either disclaimed all interest in the

land in question, or claimed title under and not adverse to that of plaintiff. See also *Boston &c. Mining Company* v. *Montana Ore Company*, 188 U. S. 632, 643. There are the same disclaimers here as in the *Crystal Springs* case, but from what we have heretofore said it will be seen that we are of opinion, in any aspect, that the bill was properly dismissed, and that the decree to that effect must be

*Affirmed.*